[No. 62974-3-I.  Division One.  January 11, 2010.]

MARK BLOOME, *Appellant*, v. JACKSON L. HAVERLY, *Respondent*.

*Patrick J. Schneider* and *Steven J. Gillespie* (of *Foster Pepper PLLC*), for appellant.

*David J. Smith* (of *David Joseph Smith PS*), for respondent.

¶1 DWYER, A.C.J. — A court may issue a declaratory judgment only where a justiciable controversy exists between adverse parties. Because the record herein does not establish the existence of a mature dispute that may be conclusively resolved by either of the forms of declaratory relief sought by the parties, a justiciable controversy does not exist between them. The grant of declaratory relief as requested by either party would constitute a prohibited advisory opinion. Accordingly, we reverse and remand for further necessary proceedings.

I

¶2 Jackson Haverly owns a house and surrounding property located on a steep bluff just south of Discovery Park in Seattle's Magnolia neighborhood. Haverly's property—the "uphill parcel"—is located uphill and immediately across

the street from an undeveloped, forested parcel owned by Mark Bloome—the "downhill parcel." From the uphill parcel, one can see Puget Sound to the south and west by looking over the downhill parcel, which runs down the bluff from the street to the shore. Haverly acquired the uphill parcel on June 30, 1995. He purchased it from Bloome and Bloome's then-spouse after having rented the property from them for several years.[1]

¶3 To facilitate the conveyance of the uphill parcel, the Bloomes executed two restrictive real covenants. One of the covenants—titled the "view covenant"—benefits the estate in the uphill parcel while burdening the estate in the downhill parcel. According to its express terms, the "intent" of the view covenant "is to maintain the existing view corridor for [the uphill parcel] as it exists on June 30, 1995," at the burden of the estate in the downhill parcel. The view covenant arose out of discussions between the parties during sale negotiations. It provides for the removal of certain trees from the downhill parcel and creates a framework for the future removal of other trees on the downhill parcel. The covenant does not expressly address the construction of any building on, or other development of, the downhill parcel.[2]

---

[1] Bloome lives in a house on a waterfront parcel immediately north of and adjacent to the downhill parcel. He also has an interest in lots immediately south of and adjacent to the undeveloped, downhill parcel. Bloome's former wife, Sharon Bloome, lives in a house on one of these southerly lots. Although both Mr. and Ms. Bloome executed the real covenant herein at issue, Ms. Bloome is not a party to this litigation.

[2] The view covenant states, in pertinent part:

Whereas, the Bloomes are planning on selling [the uphill parcel], . . . and as a part of the contemplated transaction wish to provide a view covenant . . . .

. . . .

Now, therefore, the Bloomes, as present owners of [the downhill parcel] and [the uphill parcel] hereby declare and impose the following covenant as perpetual restrictions on and against [the downhill parcel], for the benefit of [the uphill parcel], as follows:

It is agreed that between buyer and seller the intent of both parties and the burden upon [the downhill parcel] to the benefit of [the uphill parcel] is to maintain the existing view corridor for [the uphill parcel] as it exists on June 30, 1995. It is the intent of both parties and both parties acknowledge that to

¶4 The other covenant executed by the Bloomes—titled the "restrictions on development"—benefits the estate in the downhill parcel and burdens the estate in the uphill parcel. This covenant imposes specific restrictions on any future construction on the uphill parcel, including minimum setback and maximum height requirements, square footage restrictions, and aesthetic restrictions on the color and type of material to be used in future construction. It also sets forth procedures for compliance inspections of future construction.

¶5 In November 2007, Bloome filed a complaint seeking a declaratory judgment that the view covenant "does not prohibit or limit the construction of a house or other structure on the [downhill parcel]." The complaint's filing followed Haverly's refusal to sign a statement prepared by Bloome's attorney confirming that the view covenant "applies to trees but not to structures." Haverly subsequently

---

maintain the exact view is impossible, that due to tree pruning and/or removal, sometimes the view will be better than the view on June 30, 1995, and sometimes due to tree growth, it shall be worse. It is the intent and understanding to maintain a corridor of view from [the uphill parcel] through [the downhill parcel], that this corridor shall have trees in the line of sight, but that the trees shall not substantially, but may partially, block out portions of the view corridor.

It is understood that initially at [Bloome's] expense, [Bloome] shall remove nine trees as shown in the attached Exhibit B. Said tree removal shall be on or before March 30, 1996. Buyer understands that in the same general area where trees are to be removed, seller shall replace those trees with trees whose height when grown shall not exceed the height of West Ruffner Street above [the downhill parcel].

It is further understood that in the future, if trees located on [the downhill parcel] should block the view corridor of [the uphill parcel], and therefore require cutting or pruning, such cutting and pruning will be at the expense of the owner of [the uphill parcel], with the approval of the owner of [the downhill parcel]. The tree cutting company shall be a mutually agreed upon tree company.

No trees or plants shall be planted or allowed to grow in front of or directly behind the street level fence at [the downhill parcel] either to such a height or such a density that they interfere with the view corridor of [the uphill parcel]. There exists a large conifer in front of the fence [on Bloome's adjacent property]; this tree is excluded from this covenant. Should this large conifer die, or in some way be diminished in health and vigor and be removed, it is agreed that a tree or several trees that will give shielding similar to that provided by the current tree, can be planted in the same general vicinity, and those trees will not interfere with the view corridor to any greater extent than the removed conifer.

brought a counterclaim for a declaratory judgment that the view covenant "precludes any construction on the [downhill parcel] that would be in derogation of the view from the [uphill parcel] as that view existed on June 30, 1995."

¶6 After conducting discovery, the parties filed cross motions for summary judgment. In connection with their respective motions, both Bloome and Haverly submitted declarations attesting to the circumstances surrounding the execution of the two real covenants and excerpts from deposition testimony given by each party. According to this evidence, no structure existed on the downhill parcel at the time that the view covenant was executed. Further, it indicates that the parties did not discuss future limitations on the construction of any building on or other development of the downhill parcel.

¶7 In his declaration, Haverly attested to his personal beliefs as to what each party intended the covenant to mean.[3] He declared that he thought the parties understood his request for a covenant to mean "that nothing would ever be allowed to intrude into" the uphill parcel's view corridor. Haverly further affied that he never saw the specific reference to trees in the covenant "as limiting the view covenant in any way" but rather that he understood the language "only as an identification of those objects that were then intrusions [in]to my view" and as "forever preserv[ing] the view of Puget Sound from the property I was about to purchase." In addition, Haverly stated, "When I asked for a view covenant, I told Mr. Bloome I wanted to preserve the view—not just preserve the view from trees and bushes." Finally, he declared that Bloome "had never expressed to me directly that the covenant only applied to trees and bushes but not buildings." Relying on these statements and testimony in Bloome's deposition as to what Bloome thought the covenant meant, Haverly argued in his trial court briefing that the parties intended for the view covenant to provide comprehensive protection of the view from

---

[3] These statements are the subject of Bloome's motion to strike, discussed *infra*.

the uphill parcel and that it therefore restricted development on the downhill parcel.

¶8 Bloome subsequently moved to strike as inadmissible these portions of Haverly's declaration and the corresponding sections of Haverly's trial court briefing. Bloome contended that the materials pertained to each party's unilateral, subjective intent as to the meaning of the covenant. In conjunction with his motion to strike, however, Bloome submitted a second declaration of his own, in which he attested to *his* personal belief about the parties' intent, as opposed to simply what the parties did or did not discuss. Bloome characterized the statements in his second declaration as inadmissible evidence of his subjective intent and urged the trial court to consider neither his declaration nor the objected-to portions of Haverly's declaration.

¶9 The trial court granted Haverly's motion for summary judgment. It concluded that the view covenant prohibits the owner of the estate in the downhill parcel "from building a structure . . . that interferes with the view from [the uphill parcel] as it existed on June 30, 1995 so that the view of Puget Sound and the Olympic Mountains is the same as it was on the above-described date." In so doing, the trial court denied both Bloome's cross motion for summary judgment and his motion to strike.

¶10 Bloome subsequently moved for reconsideration. In support of this motion, Bloome submitted an additional declaration, in which he averred that any garage for any future house built on the downhill parcel "would have to be built at street level, and cantilevered over [the] parcel . . . because the slope is far too steep for cars to travel up and down." He further declared that "[a]ny garage at street level would interfere with . . . Haverly's view." In addition, Bloome asserted that the trial court's order effectively prohibited "all development" on the downhill parcel because "*any* construction on [the downhill parcel] will block the view of a portion of Puget Sound from [the uphill parcel]" due to the steepness of the bluff and the corresponding angle of the view from the uphill parcel. However, Bloome

did not submit any architectural plans, engineering studies, or other evidence in support of his assertion that it is impossible to build a habitable building or other structure on the downhill parcel without interfering with the view from the uphill parcel. Indeed, nothing in the record indicates that Bloome either planned or plans to construct a building on the downhill parcel. The only other item Bloome offered in support of his motion for reconsideration was a calculation of the grade and slope angle of the downhill parcel prepared by one of his lawyers who has an engineering and mathematics background.

¶11 The trial court denied Bloome's motion for reconsideration. Bloome appeals from all of the trial court's orders.

## II

¶12 We review de novo a trial court's order granting summary judgment. *Estate of Haselwood v. Bremerton Ice Arena, Inc.*, 166 Wn.2d 489, 497, 210 P.3d 308 (2009) (citing *Biggers v. City of Bainbridge Island*, 162 Wn.2d 683, 693, 169 P.3d 14 (2007)). In so doing, we engage in the same analysis as the trial court. *Hollis v. Garwall, Inc.*, 137 Wn.2d 683, 690, 974 P.2d 836 (1999) (citing *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994)). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). "A material fact is one upon which the outcome of the litigation depends in whole or in part." *Atherton Condo. Apartment-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co.*, 115 Wn.2d 506, 516, 799 P.2d 250 (1990) (citing *Morris v. McNicol*, 83 Wn.2d 491, 494, 519 P.2d 7 (1974)). "The interpretation of language contained in a restrictive covenant is a question of law," which we review de novo. *Green v. Normandy Park Riviera Section Cmty. Club, Inc.*, 137 Wn. App. 665, 681, 151 P.3d 1038 (2007)

(citing *Parry v. Hewitt*, 68 Wn. App. 664, 668, 847 P.2d 483 (1992)), *review denied*, 163 Wn.2d 1003 (2008). We also review de novo evidentiary rulings made in conjunction with a summary judgment motion. *Folsom v. Burger King*, 135 Wn.2d 658, 663, 958 P.2d 301 (1998).

## III

¶13 Bloome first contends that the trial court should have stricken both the portions of Haverly's declaration concerning the parties' personal beliefs as to the scope and meaning of the view covenant and the corresponding sections of Haverly's trial court briefing. We agree.

■■ ¶14 Our primary objective in interpreting a restrictive covenant is to "determine the intent or purpose of the covenant." *Hollis*, 137 Wn.2d at 696 (citing *Mains Farm Homeowners Ass'n v. Worthington*, 121 Wn.2d 810, 818, 854 P.2d 1072 (1993); *Burton v. Douglas County*, 65 Wn.2d 619, 621-22, 399 P.2d 68 (1965)); *see also Riss v. Angel*, 131 Wn.2d 612, 623, 934 P.2d 669 (1997). To this end, we apply the "context rule" articulated in *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990). *Hollis*, 137 Wn.2d at 686. That is, "when the meaning [of the covenant] is unclear," we must consider "the surrounding circumstances that tend to reflect the intent of the drafter and the purpose of a covenant." *Bauman v. Turpen*, 139 Wn. App. 78, 89, 160 P.3d 1050 (2007) (citing *Lenhoff v. Birch Bay Real Estate, Inc.*, 22 Wn. App. 70, 72, 587 P.2d 1087 (1978)).

¶15 However, there are limitations on the kind of extrinsic evidence a court may consider. As our Supreme Court explained in *Hollis*,

admissible extrinsic evidence does *not* include:
- Evidence of a party's unilateral or subjective intent as to the meaning of a covenant word or term;
- Evidence that would show an intention independent of the instrument; or
- Evidence that would vary, contradict or modify the written word.

137 Wn.2d at 695. "Extrinsic evidence is to be used to illuminate what was written, not what was intended to be written." *Hollis*, 137 Wn.2d at 697 (citing *Nationwide Mut. Fire Ins. Co. v. Watson*, 120 Wn.2d 178, 189, 840 P.2d 851 (1992)).

¶16 At issue in *Hollis* was the admissibility of a developer's affidavit concerning his intent as to the effect of a restrictive covenant on a subdivision development. The court held the affidavit was "not admissible . . . as it [was] the unilateral and subjective intent of [one] of the original contracting parties." *Hollis*, 137 Wn.2d at 696. We recently applied this standard in *Ross v. Bennett*, 148 Wn. App. 40, 203 P.3d 383 (2008), *review denied*, 166 Wn.2d 1012 (2009). There, we held that a subdivision developer's averments as to his and other developers' intent behind a restrictive covenant were "inadmissible statements of subjective intent." *Ross*, 148 Wn. App. at 48 (citing *Hollis*, 137 Wn.2d at 696).

▋ ¶17 Each portion of Haverly's declaration that Bloome moved to strike presents the same kind of subjective quality as was presented in the statements that were ruled inadmissible in *Hollis* and *Ross*. Therefore, the trial court should have stricken these portions of Haverly's declaration and the corresponding sections of Haverly's summary judgment briefing. In addition, as Bloome acknowledges, Bloome's second declaration submitted in conjunction with his motion to strike also contains inadmissible statements of subjective intent. Thus, the trial court should not have considered this declaration either. Accordingly, we strike the portions of Haverly's declaration identified in the briefing and discussed above, and we strike Bloome's second declaration in its entirety. We confine our review to only those parts of the record that remain.

IV

¶18 Bloome next contends that the trial court erred by granting Haverly's motion for summary judgment. Bloome

requests that we reverse and direct the trial court to enter judgment in his favor. Although we agree that Haverly is not entitled to the declaratory judgment he requested, we disagree that such a determination necessitates a grant to Bloome of the declaratory relief he seeks. To the contrary, we conclude that, in light of the status of the controversy herein presented, neither party is entitled to the declaratory relief requested.

¶19 Pursuant to the Uniform Declaratory Judgments Act (UDJA), chapter 7.24 RCW, "[a] person interested under a deed . . . may [ask a court to determine] any question of construction . . . arising under the instrument . . . and obtain a declaration of rights . . . or other legal relations thereunder." RCW 7.24.020. The UDJA is "remedial" in nature. RCW 7.24.120. Its purpose is to "settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations," and courts should liberally construe and administer it. RCW 7.24.120. However, the UDJA also provides that a court "may refuse to render or enter a declaratory judgment or decree where such judgment or decree . . . would not terminate the uncertainty or controversy giving rise to the proceeding." RCW 7.24.060. Although courts must liberally administer the UDJA, *Clallam Cnty. Deputy Sheriff's Guild v. Bd. of Clallam Cnty. Comm'rs*, 92 Wn.2d 844, 848, 601 P.2d 943 (1979), a party must satisfy certain threshold requirements before obtaining declaratory relief.

¶20 One such threshold requirement is that a justiciable controversy must exist between the parties. *Osborn v. Grant County*, 130 Wn.2d 615, 631, 926 P.2d 911 (1996). A justiciable controversy is

"(1) . . . an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive."

*To-Ro Trade Shows v. Collins*, 144 Wn.2d 403, 411, 27 P.3d 1149 (2001) (alteration in original) (quoting *Diversified Indus. Dev. Corp. v. Ripley*, 82 Wn.2d 811, 815, 514 P.2d 137 (1973)). "Absent these elements, the court 'steps into the prohibited area of advisory opinions.'" *Branson v. Port of Seattle*, 152 Wn.2d 862, 877, 101 P.3d 67 (2004) (internal quotation marks omitted) (quoting *Walker v. Munro*, 124 Wn.2d 402, 411-12, 879 P.2d 920 (1994)). Issuing an advisory opinion is allowable "only 'on those rare occasions where the interest of the public in the resolution of an issue is overwhelming.'" *To-Ro*, 144 Wn.2d at 416 (quoting *In re Disciplinary Proceeding Against Deming*, 108 Wn.2d 82, 122-23, 736 P.2d 639, 744 P.2d 340 (1987) (Utter, J., concurring)).

¶21 The record herein does not establish the existence of a mature dispute that may be conclusively resolved by either of the parties' requested forms of relief. Neither party has demonstrated entitlement to the declaratory relief requested. With respect to Haverly's contention, the view covenant itself does not evidence an intent to burden the estate in the downhill parcel to the extent he urges and as expressed in the trial court's order. The record does not indicate that the Bloomes imposed the sweeping restriction on development rights in the downhill parcel implied by Haverly's expansive reading of the covenant. Further, Haverly has not shown that it is possible to develop the downhill parcel without interfering, to at least some degree, with the view from the uphill parcel. On the other hand, the clearly expressed intent of the view covenant is to maintain the view from the uphill property as it existed on the date of conveyance. Thus, Bloome's narrow reading of the covenant is at odds with the covenant's express purpose.

¶22 However, the record does not contain facts necessary for a court to resolve the apparent underlying dispute between the parties: to what extent does the covenant limit development of the downhill parcel? The answer to this question depends on facts not contained in the record.

Bloome has not put forth any construction plan over which the parties have had the opportunity to litigate as to its conformance with the covenant. Nor has he established that it is, in fact, impossible to construct a building on the downhill parcel without interfering with the view from the uphill parcel. In the absence of a dispute over whether actual building plans satisfy the covenant or of other evidence establishing a necessary minimum degree of interference with the view from the uphill property, a declaratory judgment as requested by either party would not conclusively settle the controversy between them.

¶23 We begin with Haverly's contention that the view covenant "precludes any construction on [the downhill parcel] that would be in derogation of the view" from the uphill parcel. Again, we observe that our primary objective in interpreting a restrictive covenant is to "determine the intent or purpose of the covenant." *Hollis*, 137 Wn.2d at 696 (citing *Mains Farm*, 121 Wn.2d at 818; *Burton*, 65 Wn.2d at 621-22); *see also Riss*, 131 Wn.2d at 623; *Green*, 137 Wn. App. at 683. This objective is tempered, however, by the presumption strongly favoring the free, lawful use of land. *Burton*, 65 Wn.2d at 622. In *Burton*, our Supreme Court announced the following three principles governing the interpretation of restrictive covenants:

(1) The primary objective is to determine the intent of the parties to the agreement, and, in determining intent, clear and unambiguous language will be given its manifest meaning. *Gwinn v. Cleaver*, 56 Wn. (2d) 612, 354 P. (2d) 913 (1960); *Katsoff v. Lucertini*, 141 Conn. 74, 103 A. (2d) 812 (1954). (2) Restrictions, being in derogation of the common-law right to use land for all lawful purposes, will not be extended by implication to include any use not clearly expressed. Doubts must be resolved in favor of the free use of land. *Granger v. Boulls*, 21 Wn. (2d) 597, 152 P. (2d) 325 (1944). (3) The instrument must be considered in its entirety, and surrounding circumstances are to be taken into consideration when the meaning is doubtful. *Gwinn v. Cleaver, supra*; *B. T. Harris Corp. v. Bulova*, 135 Conn. 356, 64 A. (2d) 542 (1949); *Parrish v. Newbury*, 279 S. W. (2d) 229 (Ky. 1955).

65 Wn.2d at 621-22 (citation omitted); *see also Viking Props., Inc. v. Holm*, 155 Wn.2d 112, 120, 118 P.3d 322 (2005) (" '[R]estrictive covenants, being in derogation of the common law right to use land for all lawful purposes, will not be extended to any use not clearly expressed, and doubts must be resolved in favor of the free use of land.' " (quoting *Riss*, 131 Wn.2d at 621)).

¶24 The view covenant does not restrict the right to develop the downhill parcel to the extent that Haverly contends. Although the covenant expressly states that its intent is to "maintain the existing view corridor for the [uphill parcel] as it exists on June 30, 1995," it does not expressly prohibit the construction of buildings on the downhill parcel that may interfere, to even the slightest degree, with the view from the uphill parcel. Rather, it expressly refers only to the removal and maintenance of trees on the downhill parcel. Further, the parties agree that, during their negotiations for the sale of the Haverly property, they did not discuss any future development of the downhill parcel. Therefore, in light of the presumption favoring the free use of land in the absence of an express restriction in a real covenant, the owner of the estate in the uphill parcel does not have a right to enjoin development on the downhill parcel that interferes, to any discernable, slight degree, with the view from the uphill parcel. The doubt created by the absence of language expressly extinguishing all development rights must be resolved in favor of the free use of land. *Burton*, 65 Wn.2d at 622; *Granger*, 21 Wn.2d at 599.

¶25 In casting aside Haverly's contention, we are not required to adopt Bloome's interpretation of the view covenant. Bloome effectively seeks a declaration that the covenant does not, *in any way*, restrict the development rights of the owner of the estate in the downhill parcel. Taken to its logical conclusion, Bloome's interpretation would allow for the construction of a building that completely eliminates the view of Puget Sound from the uphill parcel. That interpretation directly conflicts with the ex-

press intent of the covenant. Although the covenant does not expressly address construction on the downhill parcel, we are not persuaded that it affords the owner of the estate of the uphill parcel *no* protection against construction that interferes with the view.

¶26 In this regard, we find it significant that the downhill parcel was undeveloped at the time the Bloomes executed the covenant. The express intent of the covenant is to maintain the view from the uphill parcel as it existed on June 30, 1995. On that date, no buildings of any type stood on the property. Only trees and other vegetation were growing on the property at that time. Therefore, it is not surprising that the covenant specifies in detail the parties' rights and duties with respect to trees. To read the covenant as allowing, without limitation, the construction of a building that substantially interferes with the view from the uphill parcel would frustrate the express intent of the covenant.

¶27 Our rejection of Bloome's argument is not to say, however, that the covenant absolutely bars the construction of any building that interferes, to even the slightest degree, with the view from the uphill parcel. Unlike the covenant restricting development on the uphill parcel, the view covenant does not impose express restrictions on the construction of any building on the downhill parcel. The presumption in favor of lawful land use therefore applies. If any construction necessarily requires some interference with the view from the uphill parcel, the covenant does not preclude such construction.

¶28 We recognize that our reasoning may appear to beg the question that is latent in this action: what kind of development on the downhill parcel or how much, if any, interference with the view from the uphill parcel does the covenant permit? The difficulty in answering this question, however, is not a product of our analysis. It is a product of the posture in which Bloome sought a declaratory judgment and moved for summary judgment.

¶29 Bloome's complaint does not refer to any plan for construction that generated a dispute between the parties based upon the covenant. Other than Bloome's bare assertion that it is impossible to build a structure on the downhill parcel without interfering with the view from the uphill parcel, there is nothing in the record tending to establish that development of the downhill parcel must necessarily occur at some expense to the view from the uphill parcel. If true, Bloome's assertion would certainly have raised a genuine issue sufficient to resist Haverly's motion for summary judgment. However, such an assertion must be supported by actual evidence. *Ellis v. City of Seattle*, 142 Wn.2d 450, 458, 13 P.3d 1065 (2000) (quoting *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 92-93, 993 P.2d 259 (2000)). Further, even if it is true, Bloome's assertion does not entitle him to the declaratory relief he requests, as his proposed interpretation of the covenant effectively eviscerates the clear statement of intent to maintain the view as it existed on the date of conveyance. Moreover, Bloome has presented no evidence tending to establish that there is a minimum, unavoidable amount of interference that would allow for a declaration that such interference or a particular construction plan is permitted under the covenant. Instead, Bloome essentially seeks declaratory relief in a vacuum. He has not alleged facts establishing the existence of a mature controversy between the parties.

¶30 Bloome's failure to set forth facts over which the parties could litigate as to whether a particular construction plan violates the covenant makes this case unlike those cases in which our Supreme Court concluded that the issuance of a declaratory judgment was proper. *Cf. Nelson v. Appleway Chevrolet, Inc.*, 160 Wn.2d 173, 186-87, 157 P.3d 847 (2007) (holding that a justiciable controversy existed over whether a car dealer could be found liable to a class of buyers for unlawfully collecting a tax because the buyers had alleged financial injury resulting from the tax collection and because construing tax statute would conclusively determine the parties' rights); *First United Methodist*

*Church of Seattle v. Hearing Exam'r for Seattle Landmarks Pres. Bd.*, 129 Wn.2d 238, 245, 916 P.2d 374 (1996) (concluding that church's constitutional challenge to the city of Seattle's nomination of church building for designation as a historic landmark was justiciable because nomination hindered church from selling property and an actual dispute existed between the parties that could be resolved by the court); *Nat'l Indem. Co. v. Smith-Gandy, Inc.*, 50 Wn.2d 124, 128, 309 P.2d 742 (1957) (concluding that it was appropriate to issue a declaratory judgment concerning whether coverage existed for an incident that had occurred); *Seattle First Nat'l Bank v. Crosby*, 42 Wn.2d 234, 246, 254 P.2d 732 (1953) (determining that declaratory judgment concerning the assignment of the principal in a trust was warranted because the interested parties' rights to the principal had vested). In the situation herein presented, Bloome has not alleged that the covenant has hindered his ability to sell the downhill parcel, and there is no construction plan or study showing that the nature of the land requires construction that will interfere with the view from the uphill parcel to some degree. Whether a structure can be built on the downhill parcel without interfering with the view from the uphill parcel is speculative based on the record. Equally uncertain is the extent to which obstruction of the view is necessary if, in fact, some obstruction is unavoidable. As there is no disputed building plan that a court can rule as being either in conformance with or in violation of the covenant, a judgment interpreting the scope of the covenant's restriction on development rights in the estate of the downhill parcel would constitute nothing more than an advisory opinion.

¶31 The issuance of a declaratory judgment is discretionary. *See King County v. Boeing Co.*, 18 Wn. App. 595, 601-02, 570 P.2d 713 (1977). Neither party is entitled to have a court adopt that party's view of the covenant if the covenant itself or the factual circumstances of the dispute do not warrant a grant of the specific relief requested. Again, the UDJA anticipates instances in which the re-

quested relief "would not terminate the uncertainty or controversy giving rise to the proceeding" and, in such cases, instructs the court to deny the requested relief. RCW 7.24.060. Neither of the parties' interpretation of the covenant at issue is supported by the covenant itself or the context in which it was executed. Further, the record does not establish the existence of an actual, mature dispute that could be conclusively resolved by the requested relief, Bloome's interpretation in particular. Accordingly, neither party has established an entitlement to the declaratory relief he seeks. Therefore, we are required to reverse the trial court's judgment and remand this matter for any further necessary proceedings.

¶32 Reversed and remanded.

GROSSE and LAU, JJ., concur.