

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

THADDEUS C. PRITCHETT, )
          ) DIVISION ONE
  Respondent/Cross-Appellant, )
          ) No. 75555-2-I (consol. with Nos.
    v.      ) 75598-6-I, 75998-1-I, 75999-0-I)
          )
PICNIC POINT HOMEOWNERS ) PUBLISHED OPINION
ASSOCIATION, a Washington nonprofit )
corporation,      )
          )
  Appellant/Cross-Respondent. ) FILED: March 19, 2018
_____ )

DWYER, J. — Thaddeus Pritchett sought to remodel his house and increase the height of his roof by seven feet, obstructing the view of Puget Sound from at least one neighboring house. After the Picnic Point Homeowners Association (the Association) denied his proposal, Pritchett sued. Concluding that the neighborhood's restrictive covenants could not be enforced as written, the trial court reversed the Association's decision and entered judgment in favor of Pritchett for $298,784. Because the plain language of the covenants and the relevant extrinsic evidence supports the Association's enforcement decision, we reverse.

I

The Picnic Point development, located in Snohomish County, is governed by Covenants, Conditions, and Restrictions (CC&Rs) that set forth the standards for development and maintenance of property in the development. The intent of

the community in adopting the CC&Rs is set forth in the document's Statement of Purpose:

> In adopting these Covenants, the homeowners of Picnic Point seek to preserve their community as a panoramic and tranquil alternative to city living. The homeowners seek to create a neighborhood that is safe and hospitable for families and children, where the natural beauty of the common areas is enhanced and where the spectacular views of Puget Sound and the Park areas are maintained. The Picnic Point homeowners understand that the most essential ingredient to a good neighborhood is good neighbors. The legal requirements set forth in this Declaration are therefore not intended to replace good neighborliness as a community ethic, but rather set threshold standards to preserve the proprietary interests of the community as a whole.

The CC&Rs established the Association, a nonprofit corporation governed by a Board of Directors (the Board). The CC&Rs also established the Picnic Point Design Committee (the Committee), which is responsible for ensuring that the construction or modification of any structure in the community complies with the requirements of the CC&Rs and the Picnic Point Design Rules. Accordingly, homeowners in Picnic Point who are seeking to make major improvements on their houses or landscape must first submit design plans to the Committee for approval. Upon compliance with the terms of the CC&Rs and the Design Rules, the Committee must approve the plans or notify the owner in writing that the plans are denied and the reasons for disapproval.

In 1996, the CC&Rs were amended to incorporate Section 7 – View Protection. Section 7.1 incorporated View Control Plans, to "protect the existing Puget Sound or Park views" in Picnic Point. The View Control Plans are parcel-specific plans that established restrictions on the maximum height for structures

built thereon.[1]  Section 7.4 of the CC&Rs provides that no structures "may be constructed or modified on any Parcel to a height which would, (i) exceed the height limitations of the View Control Plan, or (ii) obstruct the Puget Sound or Park view of any other parcel."

Thaddeus Pritchett purchased his house in the Picnic Point development in 1999.  Pritchett's house is located roughly two blocks east of a bluff above Puget Sound.  North of his house is a row of houses, behind which is a large, undeveloped area designated by the County as a native growth protection area.  Southeast of Pritchett's house is an area known as the Park Place neighborhood, located on a ridge that provides a panoramic view of Puget Sound and the Olympic Mountains.

In 2008, Pritchett sought to commence an extensive remodel of his house.  Pritchett hired an architect and moved to Bothell pending the completion of the remodel.  Pritchett initially sought to expand his house southward but scrapped those plans after his neighbors to the east objected.  Instead, Pritchett developed plans that, if completed, would increase the height of his roof by approximately seven feet.  Pritchett consulted a topographical map and walked around the neighborhood to confirm that no neighboring views would be affected by the height increase.

On May 1, 2009, Pritchett submitted his final design plans to the Committee.  The Committee was chaired by James McArthur, an aerospace

---

[1] Some groups of parcels have no specific height restriction set forth in their corresponding View Control Plans, but all parcels are subject to County regulations and the restrictions set forth in the CC&Rs.

engineer who was capable of reading plans such as those submitted by Pritchett, but who had no experience with land use planning or real property covenants. Upon receipt of the remodel plans, McArthur e-mailed six homeowners, describing the project and seeking comments and concerns. A majority of the homeowners surveyed approved of the remodel. McArthur also personally canvassed houses in the area adjacent to Pritchett's house and determined that the remodel would not impair those homeowner's views.

On May 27, 2009, McArthur e-mailed Brian Bookey, the president of the Association.[2] McArthur stated that he still had to interview two more homeowners but that, so far, he could see "no reason not to approve the remodel." Greg Oliver, the vice president of the Association, replied that the Pritchett remodel was an "easy call" as there were no covenant violations. Bookey replied that the remodel may be subject to maximum height restrictions set forth in the View Control Plan and must comply with Section 7.4 of the Declaration, which would be violated if the height of the roof "impacts another homeowners' view," though he noted that "[a]pparently it won't impact any views unless you have failed to inquire with someone who might be impacted."

The following day, McArthur wrote to Bookey to explain that Pritchett's house—like other houses in that particular area—already exceeded the View Control Plan's height restrictions. This suggested to McArthur that the height restrictions had been ignored when Pritchett's house was built. McArthur stated

---

[2] The trial court found that Brian Bookey was the president of the Association. The Association asserts that Greg Oliver—not Bookey—was the president. McArthur testified at trial that Oliver was the president of the Association, but the e-mail correspondence relied on by the trial court identifies Bookey as the president.

his belief that "as long as there is no view impact resulting from the remodel I would judge that the Design Committee has no recourse other than to approve the plans. So far we find no view infringement."

Later that evening, Bookey e-mailed McArthur stating that the proposed remodel might obstruct the view from Bookey's own house. Bookey asked McArthur to wait until the next board meeting on June 15, 2009, before making any decisions about the Pritchett proposal. Bookey stated that "I can see the roof of one of the houses on that block from my deck. If it is Lot 55, then there is a view issue from multiple houses on my street if the roof is to be higher than it is now." Bookey's house was located in the Park Place neighborhood, one-quarter mile uphill from Pritchett's house.

Around the same time, McArthur also learned that there was a potential view obstruction from the Phillips house, located near Pritchett's house. McArthur went to observe the potential impact, but it was too hazy outside to see Pritchett's house. McArthur suggested returning to the Phillips house on a clear day to observe the full impact of the remodel. This was never done. McArthur also noted that the view from the Phillips house was already obscured because of trees growing on several properties. McArthur and the Board members agreed that the trees should be trimmed or removed and that, once removed, the Pritchett remodel could not be allowed to block the view of Puget Sound from the Phillips house.

On June 7, 2009, McArthur asked Pritchett if he would be willing to place stakes on the roof of his house to help determine if any houses in the upper parts

of the development would be impacted by the remodel. Pritchett agreed. Three Committee members subsequently went to Bookey's house to inspect the view of Puget Sound and determine whether the remodel would result in a view obstruction. The group was not able to clearly see the stakes with the naked eye. After using a telescope, the group determined that the stakes were "clearly visible" and that the remodel would obstruct the view from Bookey's house.

The Committee took photographs of the stakes using a telephoto lens. The Committee concluded that any increase in height on Pritchett's house would impact views and that *any* view obstruction was a violation of the CC&Rs. The Committee turned over its recommendation to the Board, which denied Pritchett's proposal. Having concluded that any height increase would result in a view obstruction in violation of the CC&Rs, the Committee determined that further investigation into the proposal was unnecessary.

On January 5, 2010, Pritchett submitted a second proposal of a modified set of plans to the Committee for approval. The new proposed plans reduced, but did not eliminate, the increase in roof height. The Committee denied the proposal.

On September 24, 2010, Pritchett filed this action seeking a declaratory judgment that his proposal did not violate the CC&Rs and that the Association had acted unreasonably by denying his proposal. Pritchett also sought awards of damages and attorney fees. Pritchett later amended his complaint, specifically seeking an award of monetary damages for the loss of use of his property and the increased construction costs of the remodel. Following a bench trial, the trial

court entered judgment in favor of Pritchett, concluding that his proposal did not violate the CC&Rs and remanding the proposal to the Association for the issuance of an approval letter, subject to the imposition of other reasonable conditions consistent with other provisions of the CC&Rs. The trial court awarded Pritchett $298,784 in damages. The trial court concluded that Pritchett was not entitled to an award of attorney fees.

II

The Association first contends that the trial court erred by ruling that the CC&Rs could not be strictly enforced to deny Pritchett's proposal. We agree.

The interpretation of a restrictive covenant is a question of law that we review de novo. Wimberly v. Caravello, 136 Wn. App. 327, 336, 149 P.3d 402 (2006). Restrictive covenants are interpreted to give effect to the intention of the parties to the agreement incorporating the covenants and to carry out the purpose for which the covenants were created. Riss v. Angel, 131 Wn.2d 612, 621, 934 P.2d 669 (1997). "The purpose of those establishing the covenants is the relevant intent. . . . Subdivision covenants tend to enhance the efficient use of land and its value. The value of maintaining the character of the neighborhood in which the burdened land is located is a value shared by the owners of the other properties burdened by the same covenants." Green v. Normandy Park Riviera Section Cmty. Club, Inc., 137 Wn. App. 665, 683, 151 P.3d 1038 (2007) (citing Riss, 131 Wn.2d at 621-24). Accordingly, we must place "special emphasis on arriving at an interpretation that protects the homeowners' collective interests." The Lakes at Mercer Island Homeowners Ass'n v. Witrak, 61 Wn.

App. 177, 181, 810 P.2d 27 (1991). "[I]f more than one reasonable interpretation of the covenants is possible regarding an issue, we must favor that interpretation which avoids frustrating the reasonable expectations of those affected by the covenants' provisions." Green, 137 Wn. App. at 683.

In determining the intent of the parties to the agreement incorporating the covenants, we give "covenant language 'its ordinary and common use' and will not construe a term in such a way 'so as to defeat its plain and obvious meaning.'" Wilkinson v. Chiwawa Cmtys. Ass'n, 180 Wn.2d 241, 250, 327 P.3d 614 (2014) (quoting Mains Farm Homeowners Ass'n v. Worthington, 121 Wn.2d 810, 816, 854 P.2d 1072 (1993); Riss, 131 Wn.2d at 623). We examine the instrument in its entirety and use extrinsic evidence to "'illuminate what was written, not what was intended to be written.'" Wilkinson, 180 Wn.2d at 250-51 (quoting Hollis v. Garwall, Inc., 137 Wn.2d 683, 697, 974 P.2d 836 (1999)).

At issue here is Section 7.4 of the CC&Rs. That section reads:

> No structures, including fences, hedges or boundary walls may be constructed or modified on any Parcel to a height which would, (i) exceed the height limitations of the View Control Plan, or (ii) obstruct the Puget Sound or Park view of any other parcel. Provided, however, with respect to any vacant parcels, initial or new construction on all such parcels may obstruct views of Puget Sound from other parcels and/or dwelling units within Picnic Point, but such construction on a parcel may not violate any height and/or view restriction imposed by the view control plans and later additions, or modifications to the initial structures may not further obstruct such views.

We first note that the plain language of Section 7.4 is clear and unambiguous. This covenant prohibits the construction or modification of existing structures that would "obstruct the Puget Sound or Park view of any

other parcel." This is an unqualified prohibition, suggesting that *any* obstruction of existing views, no matter how minimal, is prohibited.

Section 7.4 provides an exception for new or initial construction on vacant parcels, which "may obstruct views." Notably, later additions or modifications to initial construction "may not *further* obstruct" views. (Emphasis added.) Thus, a plain language reading of the entirety of Section 7.4 leads to but one conclusion: once built, structures may not be later modified in such a way that would obstruct the existing view of Puget Sound from any other parcel. Partial or de minimis obstructions are not exempted from the scope of the covenant.

The Statement of Purpose helps to inform our understanding of the covenants contained in the CC&Rs and is consistent with our plain language reading of those covenants. The Statement of Purpose provides that the CC&Rs were adopted to "preserve [the] community as a panoramic and tranquil alternative to city living," "where the *spectacular views* of Puget Sound and the Park areas are *maintained.*" (Emphasis added.) The Statement of Purpose contemplates that the views of the homeowners, *existing as they were upon the adoption of the CC&Rs*, would be protected from future obstructions.

The extrinsic evidence surrounding the adoption of the view protection clauses also supports this understanding. Prior to the adoption of the view protection clauses, the Board put together a "covenant committee" to communicate with the homeowners, listen to any concerns that they held, and adopt covenants to address those concerns. On June 13, 1995, the Board held a meeting to discuss various matters, including the recommendations of the

covenant committee. The covenant committee told the Board that the "[m]ain interest to [the] community seems to be view protection." Community members at that time were concerned that growing trees would eventually obstruct their views of Puget Sound and that there were no express restrictions on tree height contained in the CC&Rs. The Board was asked "if view protection was a priority of the board" and responded that "this was indeed the direction and priority – maintenance of Puget Sound Views."

On October 12, 1995, the Association held a general meeting. The covenant committee introduced themselves to the homeowners in attendance and offered an explanation of the intent and language of the proposed covenants. The committee "[s]tated that a goal was to achieve view protection" and that the committee "could find nothing recorded with the Snohomish county to provide this to the Picnic Point homeowners." The obstruction of views caused by trees continued to be a concern of the homeowners in attendance. The committee explained that the goal of the proposed covenants was to "maintain views, not create views" and that, accordingly, the intent of the Board was not to destroy existing trees but, rather, to ensure that those trees are trimmed at the point that "the need to maintain a view enters."

The view protection covenants were approved by the Board and were adopted after the homeowners voted 120 to 4 in favor of the covenants. Although one of the specific concerns of the community at the time was view obstruction caused by tree growth, the overarching concern of the community was clearly *the maintenance of existing views*. It is not difficult to infer that the

homeowners, concerned about growing trees obstructing their existing views of Puget Sound, were equally concerned about the permanent obstruction of those views from house modifications.

The CC&Rs plainly prohibit construction that would "obstruct the Puget Sound or Park view of any other parcel." The Statement of Purpose and the extrinsic evidence surrounding the adoption of the covenants is consistent with the understanding that Section 7.4 prohibits *any* view obstruction, no matter how minimal. Such an interpretation also acts to protect the homeowners' collective interests, Witrak, 61 Wn. App. at 181, and "avoids frustrating the reasonable expectations of those affected by the covenants' provisions." Green, 137 Wn. App. at 683. Were homeowners permitted to marginally obstruct the views of other homeowners, existing views would not be maintained. Accordingly, we conclude that the Association did not err by enforcing the restrictive covenant as written.

The trial court reached a different result. The trial court first found that Section 7.4 was ambiguous because the phrase "obstruct the Puget Sound or Park view of any other parcel" referred to "no objective standard against which it can be measured." The trial court then turned to extrinsic evidence to determine the intent of the drafters of the covenant. The trial court considered the minutes from a 2000 Board meeting in which a former Board member stated that the CC&Rs were not intended to be enforced "to the letter" and that the view of Puget Sound was not intended to be "100% of the Sound."

Based solely on the 2000 Board meeting minutes, the trial court determined that the drafters of the covenants did not intend for the view protection clauses to be applied literally. The trial court determined that the Association was "required to use a flexible approach on a case-by-case basis in applying its terms to avoid absurd results." The trial court noted that the Board applied a "flexible approach to the enforcement of view encroachments from trees" and concluded that Section 7.4 must be interpreted to provide the same flexibility. Accordingly, the trial court concluded that the Board's rejection of Pritchett's proposal was manifestly unreasonable and inconsistent with the intent of the drafters of the covenants. The trial court ordered the Association to approve Pritchett's proposal and further ordered that the Association could not strictly enforce Section 7.4 unless it amended the CC&Rs to create "objective, measureable standards."

The trial court's analysis was flawed and its ruling erroneous. First, the trial court improperly imputed a de minimis standard into the phrase "obstruct the Puget Sound or Park view of any other parcel." Contrary to the trial court's analysis, there already exists an objective standard against which the prohibition, as written, can be measured. A homeowner's existing view is either obstructed or it is not obstructed. Silence as to the *extent* of an obstruction does not create an ambiguity—"'[i]t is the duty of the court to declare the meaning of what is written, and not what was intended to be written.'" Wilkinson, 180 Wn.2d at 252 (internal quotation marks omitted) (quoting Berg v. Hudesman, 115 Wn.2d 657, 669, 801 P.2d 222 (1990)). By assuming that a minimal view obstruction could

not possibly violate the covenant, the trial court introduced subjectivity to a standard that was otherwise facially objective. Moreover, the trial court's analysis ignored the Statement of Purpose—an integral part of the CC&Rs that is helpful for illuminating the purpose of the covenants contained therein. See Nelson v. Duvall, 197 Wn. App. 441, 453, 387 P.3d 1158 (2017) ("[I]n determining legislative intent, the 'preamble or statement of intent can be crucial to interpretation of a statute.'" (quoting Towle v. Dep't of Fish & Wildlife, 94 Wn. App 196, 207, 971 P.2d 591 (1999))).

Second, the trial court's analysis eschewed relevant extrinsic evidence and considered only statements made by select former Board members *four years after* the view protection clauses were adopted.[3] But the intent of the homeowners who voted to adopt the covenants cannot be discerned through the post-hoc statements of individual Board members. See W. Telepage, Inc. v. City of Tacoma Dep't of Fin., 140 Wn.2d 599, 611, 998 P.2d 884 (2000) ("A noncontemporaneous understanding of legislative intent is not reflective of the Legislature's rationale for enacting a 1981 statute."); see also In re F.D. Processing, Inc., 119 Wn.2d 452, 461, 832 P.2d 1303 (1992) ("[T]he comments of a single legislator are generally considered inadequate to establish legislative intent."); State v. Leek, 26 Wn. App. 651, 657-58, 614 P.2d 209 (1980) (statements made by individual legislators five years after bill's enactment were

---

[3] Moreover, the trial court's analysis ignored the context in which the statements were made. The topic of discussion at the 2000 Board meeting was the obstruction of existing views by trees and whether the Association should be flexible in requiring the trimming and removal of trees, *not* whether the Association should be flexible in applying the view protection covenants generally.

not competent to prove legislative intent). Neither can the court consider evidence that varies, contradicts, or modifies the written word. <u>Bloome v. Haverly</u>, 154 Wn. App. 129, 138, 225 P.3d 330 (2010). Rather, the appropriate epoch for consideration was the period of time leading up to the adoption of the view protection clauses. It was during this time that the covenants were drafted, the drafters explained the proposal to the homeowners, and the homeowners who voted "yes" formed their reasons for so doing.

Third, the trial court's order directing the Association to apply the CC&Rs flexibly and on a case-by-case basis ignores that the Association has already made case-by-case determinations regarding structure height by adopting the parcel-specific View Control Plans. The CC&Rs will cease to be generally applicable to all homeowners if the Association is required to apply the covenants therein on a case-by-case basis, prohibiting some view obstructions while permitting others. The Association reasonably believes that applying the CC&Rs flexibly will result in the inconsistent application of the covenants and will allow homeowners to "nibble away [at views] 2 feet at a time." The trial court recognized that this was a possibility, but dismissed the Association's concerns because they have yet to come to fruition.

Finally, the trial court's conclusion that the CC&Rs could not be reasonably interpreted to prohibit Pritchett's proposal is belied by its order directing the Association to amend the CC&Rs and *add language* to conform to the court's interpretation. Rather than interpreting the writing to declare what was written, the trial court declared that which it believed the drafters *intended* to

write and then required the Association to amend the CC&Rs to conform to the court's vision. "A court may not create a contract for the parties which they did not make themselves. It may neither impose obligations which never before existed, nor expunge lawful provisions agreed to and negotiated by the parties." Agnew v. Lacey Co-Ply, 33 Wn. App. 283, 288, 654 P.2d 712 (1982).

The plain language of Section 7.4 prohibits homeowners from constructing or modifying structures if doing so would "obstruct the Puget Sound or Park view of any other parcel," regardless of the severity of the obstruction. This plain language understanding is supported by the statement of purpose and the extrinsic evidence surrounding the adoption of the covenants. By ruling otherwise, the trial court erred.

III

The Association also contends that the trial court erred by ruling that it had violated Pritchett's procedural due process rights. We agree.

The trial court ruled that, in addition to the Association's substantive error in denying Pritchett's proposal, its decision was "based on a flawed process, which resulted in the denial of due process . . . during the consideration of the Pritchett proposals." The trial court captioned this section of its analysis as "Procedural Due Process Violation." But the trial court did not analyze or otherwise discuss procedural due process in its decision. Rather, the trial court lamented what it saw as the many failings of the Committee to adhere to the requirements set forth in the CC&Rs. The trial court concluded that "procedural

due process does apply" and that, accordingly, the Association's decision denying Pritchett's proposal should be reversed.

The Fourteenth Amendment's due process clause limits the activities of state actors. Shanks v. Dressel, 540 F.3d 1082, 1087 (9th Cir. 2008). The Association is a private entity that could not have violated Pritchett's procedural due process rights by denying his proposal. Instead, due process was provided to Pritchett during the judicial proceeding. Pritchett tacitly concedes that this "may be true in the strictest sense," Br. of Resp't/Cross-Appellant at 45, but nevertheless asserts that the trial court's ruling was correct.

The only authority Pritchett cites in support of the trial court's ruling is Shelley v. Kraemer, 334 U.S. 1, 68 S. Ct. 836, 92 L. Ed. 1161 (1948). In that case, the Supreme Court considered a challenge to covenants that prohibited non-whites from owning or occupying property. Shelley, 334 U.S. at 4-8. The Court held that the judicial enforcement of such covenants violated the Fourteenth Amendment's requirement of equal protection of the laws. Shelley, 334 U.S. at 20. The state court was the state actor therein. In addition, the Court explicitly declined to consider whether the due process clause applied to the disputed action. Shelley, 334 U.S. at 23. Shelley does not support the trial court's ruling.

IV

Pritchett cross-appeals, contending that the trial court erred by denying him an award of attorney fees pursuant to RCW 64.38.050. That statute provides, in pertinent part, "Any violation of the provisions of [the statutes

- 16 -

governing homeowners' associations, chapter 64.38 RCW] entitles an aggrieved party to any remedy provided by law or in equity. The court, in an appropriate case, may award reasonably attorneys' fees to the prevailing party."

Because we reverse the trial court, Pritchett is no longer the prevailing party and is not entitled to an award of attorney fees pursuant to RCW 64.38.050.

Reversed and remanded.[4]

_Dwyer, J._

We concur:

_Leach, J._      _Becker, J._

---

[4] Because we reverse the trial court's declaratory judgment, we necessarily also reverse the court's order entering a $298,784 judgment in favor of Pritchett.