IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| EAGLE SPRINGS PROPERTY OWNERS ASSOCIATION, a Washington nonprofit corporation, | ) ) ) | No. 40049-2-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JEREMY C. MEYER and AMBER R. MEYER, husband and wife, individually and the martial community comprised thereof, | ) ) ) ) ) | |
| | ) | |
| Appellants. | ) | |

COONEY, J. — Eagle Springs Property Owners Association (Eagle Springs) is the homeowners' association (HOA) for Eagle Springs Ranch. Amber and Jeremy Meyer (Meyers) purchased property in Eagle Springs Ranch in 2017. Thereafter, residents began complaining that the Meyers property was noncompliant with Eagle Springs' Covenants, Conditions, and Restrictions (CCRs) as it was covered with garbage, junk, litter, defunct cars, and a recreational vehicle (RV). Eagle Springs filed a complaint against the Meyers related to the Meyers' alleged breach of Eagle Springs' CCRs. Following a bench trial, judgment was entered in favor of Eagle Springs.

The Meyers appeal.  Finding no error, we affirm.

BACKGROUND

Eagle Springs is a HOA and Washington nonprofit corporation formed to maintain "common areas & roads" and enforce "the CC&Rs for a rural land development." Clerk's Papers (CP) at 4; Ex. P-38.  Eagle Springs' governing documents are the bylaws and the CCRs.  Members of Eagle Springs are "the property owners of Eagle Springs Ranch."  Ex. P-33.  Eagle Springs Ranch is located in Wilson Creek, Washington, and consists of "15,000 acres and 288 ranches."  Rep. of Proc. (RP)[1] at 485-86, 952; CP at 409.  The Meyers purchased a property in Eagle Springs Ranch (Property) in 2017.

The CCRs contain various provisions and restrictions "applicable to all tracts." Ex. P-34.  The CCRs state, in relevant part:

> 5.10 <u>Trash:</u> No Tract may be used for temporary or permanent storage of rubbish or trash (collectively, garbage). No garbage may be kept on any Tract except in covered containers and screened from view from adjacent Tracts.
>
> 5.11 <u>Junkyards, Auto Repair, Second-Hand Business, Material Storage:</u> No junkyards, auto repair, second-hand business or other commercial uses that create a negative visual impact, excessive noise or congestion from traffic or parking shall be conducted on any Tract. No storage of trucks, cars, buses, machinery, equipment or building materials shall be stored on any Tract unless enclosed in a proper structure to not be visible from an adjoining Tract or passing on the roadway.

Ex. P-34.  In regard to noncompliance with the CCRs, the CCRs provide:

---

[1] This opinion refers to the report of proceedings covering the duration of trial.

2.11 Notice of Noncompliance: In the event the Association determines that any Owner has not complied with the provisions of this Declaration, the Association may, at its option, give written notice to the Owner of the conditions complained of. The Owner shall correct same or, if not readily correctable within fifteen (15) days after notice from the Association, the Owner shall submit corrective plans proposing its remedy to the condition complained of with fifteen (15) days after notice from the Association. The Association shall approve or disprove any plans submitted by the Owner and set forth a reasonable time for correction of the condition complained of. In the event such condition is not corrected according to the approved plans, within the allotted time, the Association shall have the right to undertake to remedy such condition or violation complained of. The cost thereof shall be levied as a Special Assessment to such Owner and enforceable by the Association in the same manner any other unpaid assessment. The Association is hereby granted the right of entry on any affected Tract to so correct the condition or violation complained of.

Ex. P-34.

Eagle Springs received the first complaint about the Property in December 2018. The Eagle Springs Board of Directors (Board) closed this complaint without taking any action. The Board received another complaint about the Property in May 2020. The complaint, submitted by Mark Mitchell, read:

This complaint involves lot 241. The complaint itself is in CC&R laws, number 5.10. This involves garbage, junk and litter making their property an eyesore. I've had many other owners complain to me about the same issue. Jeremy and Amber Meyer have been asked to clean up their property. Litter has been blown away and on others property. This is not a good representative of what owners have put into their property but is in clear view of traffic on Black Rock rd.

Ex. D-55. A few days later, the Board received another complaint about the Property, stating:

> THERE IS AN UNACCEPTABLE MESS <u>OF TRASH</u> ON THIS
> PROPERTY!! IT IS SO ONEROUS IT CAN BE SEEN FROM
> MULTIPLE SPOTS ON THE RANCH. IT IS A HEALTH HAZARD IN
> THE EXTREME, AND AN EYESORE WHICH SHOULD BE AN
> EMBARRASMENT TO THE OWNER. THEY HAVE BEEN WARNED
> AND SPOKEN TO MULTIPLE TIMES BY SEVERAL PEOPLE
> INCLUDING THE NEW BOARD. IT IS IN THE CCNR'S THAT IS NOT
> TO BE TOLERATED. WE ARE A COMMUNITY AND SUPPORT ONE
> ANOTHER. BUT THIS FAMILY IS IN VIOLATION OF THE RULES,
> THE HEALTH RISK <u>AND</u> OUR SENSE OF COMMUNITY!!

Ex. D-55.

Gregory Edwards, Board president at the time of the May 2020 complaints, testified that he or members of the Board "talk[ed] to [the Meyers] and let them know that there had been a complaint and that they needed to clean up the trash" after receiving the complaints. RP at 148. Mr. Edwards also testified he was familiar with the Property and had spoken with the Meyers about the trash on it approximately "[h]alf a dozen times" prior to receiving the May 2020 complaints. RP at 156.

On June 3, 2020, the Board sent an e-mail to Ms. Meyer requesting permission to enter the Property "to investigate complaints" against the Meyers. Ex. D-56. Ms. Meyer denied the Board's request, stating she had viewed "photos and videos" allegedly depicting CCR violations and disagreed they validated the complaints. Ex. D-56. Photographs of the Property were sent to the Meyers on June 7, 2020.

In response to the May 2020 complaints, Mr. Edwards conferred with the Board and elected to send the Meyers a letter formally notifying them of the alleged CCR violations. This letter, dated June 3, 2020, but sent to the Meyers on June 9, 2020, read:

This letter is formal notice to notify you of numerous complaints submitted to the Eagle Springs Ranch Property Owners Association concerning tract # 241. Complaints received allege that property owners Amber and Jeremy Meyer of tract # 24-1 are in violation of CC&R 5.10, upon further review it was also determined the Tract 241 also appeared in violation of 5.11.

. . . .

According to section 2.11 of the CC&R's, you are required to submit a corrective plan to remedy the condition complained of within 15 days of written notice. The ESRPOA Board is requesting that you submit your written corrective plan to remedy to the esrpoaboard@gmail.com, by June 18, 2020 by 3:00 pm. Once the board approves of the plan, a reasonable timeframe for correction of the violation will be determined.

. . . .

As a board member, it is imperative that you set an example and as such being compliant with the CC&R's is paramount for that example. Furthermore, failure to comply or act in good faith to remedy the situation and cooperate with the Board, may result in removal from your current position on the Board.

Enclosed are photographs of the property taken.

Ex. D-59. The Meyers did not respond to this letter.

The Board held a meeting on June 28, 2020, to discuss the May 2020 complaints. The Board noted it had not received any communications from the Meyers since the June 3 letter was sent to them. The Board voted to remove Ms. Meyer, who at the time of the meeting was a Board member, from the Board. The Board also adopted a fine schedule

No. 40049-2-III
*Eagle Springs v. Meyer*

for members who violate the CCRs and voted to "place fines" [2] on the Meyers for their

noncompliance with the CCRs. Ex. P-83.

The Board sent another letter to Meyers on June 28, stating, in relevant part:

On June 7, 2020 you were served notice Pursuant to CC&R 2.11, of a
violation complaint relating to your property. You were asked to respond to
the Board with a written plan to remedy said violations within 15 days of
notice; compliance date was set for June 22, 2020. In good faith, the Board
waited until the end of business day on June 26, 2020, in hopes of receiving
a response, however, none was received.

This letter now serves as the second **Official Notice** to submit corrective
plans proposing its remedy to the conditioned complaint of CC&R 5.10 and
5.11. You have 15 days to either correct said violations, or if not readily
correctable within 15 days, submit corrective plans proposing its remedy
regarding the violations previously described. A second compliance date of
**July 15, 2020** has been set, and the Board expects to receive your response
at esrpoaboard@gmail.com no later than 5:00 PM that same day. The
Board is also making an official request in accordance to CC&R 2.11, for
you to cooperate with the verification of this violation and schedule a time
for Board member(s) to inspect your property prior to the July 15, 2020
deadline. Please email the board immediately at esrpoaboard@gmail.com
to schedule an inspection date and time.

Failure to respond to the Board's request to provide a written plan to
remedy the violation and to allow for the Board to verify the violation or
correction of violation will result in special assessments and/or fines by the
Eagle Springs Ranch Property Owners Association Board of Directors to be
assessed starting at 20 days of this notice. Fines will be assessed weekly
until corrective plans are received or the violations have been corrected.
Proof of corrections must be submitted and verified by a Board member
before any fines are ceased. The fines have been outlined as follows:

_____

[2] The parties and the court refer to these fines interchangeably as "fines," "fees,"
"assessments," and "special assessments." CP at 274-75; Br. of Appellants at 14, 22, 26;
Br. of Resp't at 2.

6

> • $25 a week starting July 20 for the following 13 weeks ending October 17, 2020.
> • $50 a week starting October 18, 2020 for the following 26 weeks ending April 17, 2021.
> • $125 a week starting April 18, 2021 until violations are remedied and fines have been paid in full.
> . . . .

Ex. D-62 (emphasis added). The fine schedule contained in the letter was the same schedule adopted at the June 28 Board meeting.

On July 15, 2020, the Meyers sent an e-mail to the Board denying the Property was in violation of CCR sections 5.10 or 5.11 and reiterating that they were not allowing the Board access to the Property, citing COVID-19 restrictions.

Eagle Springs assessed 13 weekly fines of $25.00 against the Meyers between July 20 and October 18, 2020.[3] Fines continued to be assessed against the Meyers in accordance with the fine schedule contained in the June 28 letter, until March 2021, at which time the fine schedule was adjusted.

In July 2021, Eagle Springs filed a complaint against the Meyers for breach of the CCRs, injunctive relief, foreclosure of lien, trespass, declaratory relief, and a judgment for delinquent special assessments alleged to be "at least $4,372.00." CP at 3-14.

---

[3] Ex. P-40 lists weekly invoices beginning on August 3, 2020. However, Mr. Mitchell admitted in a declaration that Eagle Springs originally levied fines against the Meyers for the weeks of July 20, 2020 and July 27, 2020. Due to the COVID-19 Proclamations in force at the time, Eagle Springs was not permitted to levy fines against the Meyers until July 31, 2020. Thus, Eagle Springs did not seek to enforce the July 20, 2020 or the July 27, 2020 fines. Governor's Proclamation 20-51.6; Governor's Proclamation 20-51.

In September 2022, a court-ordered inspection of the Property occurred, during which photographs of the Property were taken. Eagle Springs' complaint was subsequently tried to the bench. Many of the photographs taken during this inspection were admitted at trial.

At trial, Mr. Edwards, Mr. Mitchell, and Sara Strommer, Board treasurer during the relevant time frame, among others, testified for Eagle Springs. The Meyers proceeded pro se and presented the testimony of Lena Coleman-Meyer and Ms. Meyer.

Mr. Edwards testified consistent with the above. He also testified he had seen the Property before the Board received complaints. He attested complaints about other properties had been reported in the past "and that is when the board would then take action." RP at 256. He testified all prior reported CCR violations "required corrective action," that the violations were corrected "[i]n accordance with what the board deemed corrected," and that the Meyers' CCR violations were the only ones that had not been corrected. RP at 256-57. Mr. Edwards verified that the Board had never encountered a situation where a member refused to comply with the CCRs after multiple notices prior to the complaints against the Meyers.

Mr. Mitchell testified he could see trash and vehicles on the Property from his property. He testified he "could see trash, a lot of it," and he "could see litter" at the time he made the complaint against the Meyers. RP at 373. Mr. Mitchell additionally testified an RV and at least one car could be seen from his home.

8

Ms. Strommer testified that she saw, while on walks past the Property, "what looks like trash across the [Meyers'] property. We've seen the vehicles and the buildings, the pallets that have been put up." RP at 656. She testified she saw what appeared to be "garbage bags" "strewn" on the Property as well as what appeared to be "inoperable vehicles." RP at 656-67, 710.

Ms. Meyer testified that she and her husband visited Eagle Springs Ranch in 2012 with Mr. Edwards. She verified while "exploring the ranch, I had observed what I believed to be contradictions to the rules listed in the CC&Rs" and that Mr. Edwards told her that "the CC&Rs were not enforced." RP at 1322. She testified there were CCR violations on other properties still present at the time of trial. Ms. Meyer testified she and Mr. Meyer "were looking to purchase property to homestead and be off gr[id] and fairly self-sufficient. We already had owned a home in an association and we did not want to be in another one that had rules and restrictions that would limit what we were wanting to accomplish." RP at 1338. She additionally testified the lack of CCR enforcement was a reason they decided to purchase the Property but that they "were aware that the restriction in the CC&Rs could very much limit what we were trying to accomplish and perform." RP at 1338.

The court issued a letter ruling in favor of Eagle Springs after the trial concluded. It later entered findings of fact and conclusions of law. The court found, in relevant part, Eagle Springs' "assessments against the Meyers are valid and enforceable." CP at 275.

9

It found "[t]he Meyers failed to prove [Eagle Springs] has habitually and substantially tolerated violations of its CCRs nor that violations by other residents have eroded the general plan of the CCRs rendering their enforcement useless and inequitable." CP at 275. The court awarded a judgment in favor of Eagle Springs for "$16,157.00 for unpaid assessments" and awarded Eagle Springs its attorney fees. CP at 275. The court also concluded Eagle Springs "is not entitled to an injunction because there is an adequate remedy at law through enforcement of the CCRs." CP at 276.

The Meyers timely appeal.

### ANALYSIS

On appeal, the Meyers argue: (1) the fines were invalid; (2) Eagle Springs was not entitled to enforce the CCRs; (3) the Board breached its fiduciary duties; (4) the court's decision to award a monetary judgment to Eagle Springs was erroneous; (5) the court cited the incorrect nonprofit corporations statute in its findings; (6) the court cited the incorrect definitional HOA statute in its findings; (7) the court incorrectly described RCW 64.38.020(11) in its findings; and (8) the court was biased against them.

VALIDITY OF SPECIAL ASSESSMENTS

The Meyers argue the trial court's finding that the "assessments against the Meyers are valid and enforceable" is erroneous for a multitude of reasons. CP at 275.[4]

---

[4] The court's finding that the assessments were valid and enforceable is a conclusion of law. The Meyers do not engage in the substantial evidence test but instead

10

Specifically, the Meyers contend: (1) the special assessments were levied against them in violation of the Governor's COVID-19 proclamations; (2) their due process rights were violated; (3) the complaints were not verified; (4) there was no previously established fine policy; (5) the June 28, 2020 meeting adopting the fine schedule was not a valid meeting; (6) fines could not be levied against them because Eagle Springs incurred no costs; and (7) the fines were levied against them for an invalid purpose. We disagree with each contention.

Following a bench trial, our review "is limited to determining whether substantial evidence supports the court's findings of fact, and if so, whether the findings support the conclusions of law." *Keever & Assoc., Inc. v. Randall*, 129 Wn. App. 733, 737, 119 P.3d 926 (2005). Substantial evidence exists if there is evidence sufficient to persuade a fair-minded person of the truth of the finding. *Id.* Unchallenged findings of fact are verities on appeal. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 808, 828 P.2d 549 (1992). We review errors of law de novo. *Trotzer v. Vig*, 149 Wn. App. 594, 605, 203 P.3d 1056 (2009). We review a finding of fact erroneously labeled as a conclusion of law as a finding of fact, and we review a conclusion of law mislabeled as a finding of fact as a conclusion of law. *Scott's Excavating Vancouver, LLC v. Winlock Props., LLC*, 176 Wn. App. 335, 342, 308 P.3d 791 (2013).

---

argue there were multiple reasons why the assessments were not valid.

*Governor's Proclamations*

The Meyers argue Eagle Springs levied fines against them in violation of the

Governor's COVID-19 proclamations. Eagle Springs responds that it did not seek to

enforce the fines levied in violation of the Governor's Proclamation.

Governor's Proclamation 20-51 suspended RCW 64.38.020(11) from April 17,

2020, through July 31, 2020. *See* Governor's Proclamation 20-51.6. RCW 64.38.020

states:

> Unless otherwise provided in the governing documents, [a homeowner's]
> association may:
>
> (11) Impose and collect charges for late payments of assessments and, after
> notice and an opportunity to be heard by the board of directors or by the
> representative designated by the board of directors and in accordance with
> the procedures as provided in the bylaws or rules and regulations adopted
> by the board of directors, levy reasonable fines in accordance with a
> previously established schedule adopted by the board of directors and
> furnished to the owners for violation of the bylaws, rules, and regulations of
> the association[.]

The Meyers point out, and Eagle Springs admits, fines were assessed against the Meyers

on July 20 and July 27, 2020. However, Eagle Springs did not seek to enforce the fines

and issued a revised invoice that did not include the disputed fines. Because Eagle

Springs did not seek to enforce the fines assessed against the Meyers during the period

covered by Governor's Proclamation 20-51, the Meyers' argument fails.

*Due Process*

The Meyers next argue Eagle Springs violated their right to due process. Particularly, they allege the violation notices failed to adequately apprise them of the nature of the violations and did not follow the procedures outlined in the CCRs or applicable statutes. Eagle Springs responds that the letters were adequate, Eagle Springs is not a state actor, and this issue is raised for the first time on appeal.

Preliminarily, Eagle Springs claims this court could refuse to review the issue because it was not raised in the trial court. RAP 2.5. We disagree. The Meyers argued Eagle Springs violated their due process rights throughout trial. We therefore address the Meyers' purported due process violation.

Eagle Springs argues the Meyers' due process claim fails because it is not a state actor. We agree. "The Fourteenth Amendment's [to the United States Constitution] due process clause limits the activities of *state actors*." *Pritchett v. Picnic Point Homeowners Ass'n*, 2 Wn. App. 2d 872, 887, 413 P.3d 604 (2018) (emphasis added). Eagle Springs is a private entity and therefore could not have violated the Meyers' due process rights. *Id.* Notably, the Meyers do not argue their due process rights were violated during the judicial proceedings. *Id.* Thus, their claim that their Fourteenth Amendment rights were violated fails.

Insofar as the Meyers argue Eagle Springs failed to follow "the procedure outlined in the [CCRs]" and RCW 64.38.030(11), we disagree. Br. of Appellants at 29.

In compliance with section 2.11 of the CCRs, the Meyers were provided with two letters, one dated June 3, 2020, and another dated June 28, 2020, providing them notice of the violations. The June 3 letter stated, in relevant part, that it was "formal notice to notify you of numerous complaints submitted to [Eagle Springs]," and that it appeared their Property was in violation of CCR sections 5.10 and 5.11. Ex. D-59. The letter stated the Meyers were "required to submit a corrective plan to remedy the condition complained of within 15 days of written notice" so, June 15, 2020. Ex. D-59. The letter also recited CCR sections 5.10, 5.11, and 2.11 and included photographs.

The June 28 letter stated, "[o]n June 7, 2020 you were served notice Pursuant to CC&R 2.11, of a violation complaint relating to your property." Ex. D-62. This letter was purportedly "the second **Official Notice** to submit corrective plans proposing its remedy to the conditioned complaint of CC&R 5.10 and 5.11." Ex. D-62. The June 28 letter gave the Meyers until July 15, 2020, to "submit corrective plans proposing [their] remedy regarding the violations previously described." Ex. D-62. The letter also stated fines would be assessed "weekly until corrective plans are received or the violations have been corrected." Ex. D-62. The letter included the applicable escalating weekly fine schedule.

The Meyers contend the June 3 letter "did not state the details of the complaint, if there was a violation, the specific nature of the violation or provide any proof of a violation." Br. of Appellants at 31. Contrary to the Meyers' argument, the letter clearly

stated the Meyers were in violation of CCR sections 5.10 and 5.11 and contained pictures of the Property. The Meyers do not explain how the letter did not comply with CCR section 2.11 or RCW 64.38.030(11).

As for the June 28 letter, the Meyers claim it "does not elaborate or provide any additional information regarding violations." Br. of Appellants at 31. They further assert the notices did not attest to Eagle Springs having verified the complaints. Finally, as it relates to CCR section 2.11, the Meyers write, "the Association needs to give notice of violations and the Owner needs to provide a corrective plan 'only if not readily correctable within fifteen days,' it does not require a corrective plan be presented immediately or before complaints have been verified or allow entry to verify complaints." Br. of Appellants at 32.

The Meyers misapprehend and misquote CCR section 2.11. The section states, "*if not readily correctable within fifteen (15) days* after notice from the Association, the Owner shall submit corrective plans proposing its remedy to the condition complained of with fifteen (15) days after notice from the Association." Ex. P-34 (emphasis added). The section does not state an owner must provide a corrective plan "only" if the condition is not readily correctable within 15 days. Further, the section makes no mention of complaint verification and, even if it did, the June 3 letter contained photos of the Property indicating the Board had observed the violations.

The Meyers' due process rights were not violated because Eagle Springs is not a state actor. Moreover, the Meyers fail to demonstrate Eagle Springs' violation notices were inadequate or otherwise did not comply with CCR section 2.11 or RCW 64.38.030(11).

*Complaint Verification*

The Meyers argue the Board's actions were arbitrary and capricious because the complaints were never verified prior to the fines being levyied against them.

An action is arbitrary and capricious if it is a "willful and unreasoning action, taken without regard to or consideration of the facts and circumstances surrounding the action." *Abbenhaus v. City of Yakima*, 89 Wn.2d 855, 858, 576 P.2d 888 (1978). However, an action is not arbitrary and capricious when "there is room for two opinions," and the action is taken after "due consideration." *Id.*

Eagle Springs argues the Meyers raise their arbitrary and capricious argument for the first time on appeal. We disagree with Eagle Springs. The Meyers raised the issue in their trial brief and multiple times at trial. Thus, we proceed to review the claimed error.

Turning to the merits, the Meyers argue the Board's failure to verify the complaints before taking action against them was arbitrary and capricious. Contrary to the Meyers' assertion, the Board was aware of the violations prior to the June 3 and June 28 letters being sent and the subsequent assessment of fines.

16

Then Board president, Mr. Edwards, testified he had seen the state of the Meyers' property many times prior to the formal complaints. He further testified that he had spoken with the Meyers regarding the "trash on their property" approximately "half a dozen times" prior to receiving the May 2020 complaint. RP at 156. Ms. Strommer and Mr. Mitchell also testified they witnessed trash, defunct vehicles, and other debris on the Property.

To the extent the Meyers claim the June 3 and June 28 letters were sent to them prior to the complaints being verified, we disagree. The letters were simply notices to the Meyers that complaints had been received by the Board. Both letters requested that the Meyers submit plans regarding how to remedy the violations on their Property. Thereafter, the Meyers made it difficult for the Board to fully assess the validity of the complaints because they refused to allow the Board access to the Property. Further, by the time fines were assessed against the Meyers in late July 2020, Mr. Mitchell had sent photographs of the Property to the Meyers. Importantly, the Meyers had been informally notified by the Board, prior to the June letters, that the state of the Property violated the CCRs.

Finally, the violations on the Property were ultimately verified. During a court ordered inspection in 2022, photographs were taken of the Property that showed trash and debris, large piles of wood pallets, what appeared to be weathered building materials such as broken windows, doors, tin roofing materials, and other refuse. Trial exhibits also

depicted an older RV with vehicle tabs that expired in 2014, multiple cars, old exercise equipment, and car seats on the Property.

Thus, the Meyers' argument that the complaints were not verified prior to the Board's assessment of fines against them fails.

*Fine Policy*

The Meyers argue the Board did not have a previously adopted fine schedule prior to levying fines against them.

RCW 64.38.020(11) states, in relevant part, an HOA can "levy reasonable fines in accordance with a previously established schedule adopted by the board of directors and furnished to the owners for violation of the bylaws, rules, and regulations of the association." The Board held a meeting on June 28, 2020. The meeting minutes reflect that the Board discussed "amending the bylaws to start assessing fees and or fines on" property owners if they do not correct CCR violations. Ex. P-83. It also adopted a fine schedule:

- $25 a week starting July 20 for the following 13 weeks ending October 17, 2020.

- $50 a week starting October 18, 2020 for the following 26 weeks ending April 17, 2021.

- $125 a week starting April 18, 2021 until violations are remedied and fines have been paid in full.

Ex. P-83. This adopted fine schedule is the same schedule contained in the June 28, 2020, letter sent to the Meyers.

18

The Meyers claim there is no record of a vote being held on adoption of the fine schedule and argue it was only "discussed" at this meeting. Br. of Appellants at 37. They point to the fact that a slightly different fine schedule was disseminated to members of Eagle Springs in March 2021. However, the Board's later adoption of a different fine schedule does not demonstrate that one was not adopted on June 28. Further, the June 28 meeting minutes state "[t]he fines are as follows," which indicates they were adopted. Ex. P-83.

Finally, the Meyers point to testimony from Mr. Edwards that the Board had not finalized the fine schedule as of the June 28 meeting. However, Mr. Edwards' testimony was equivocal. Mr. Edwards was asked, "so on June 28th of 2020, at that meeting did the board adopt a fine schedule and incorporate it into the minutes of the meeting?" RP at 327. Mr. Edwards responded, "We adopted the structure and I believe *we may or may not* have been still playing with the numbers." RP at 327 (emphasis added).

The Meyers' argument that there was no previously adopted fine schedule prior to fines being levied against them fails.

### *Validity of June 28, 2020, Meeting*

The Meyers assert the June 28 meeting was invalid because the meeting minutes do not reflect that Eagle Springs members were notified of the meeting, the meeting minutes are on different letterhead than prior meeting minutes, and there is no record of the meeting minutes being approved by the Board.

Eagle Springs responds that this issue is raised for the first time on appeal and should not be reviewed. We agree with Eagle Springs. Typically, this court will not review issues raised for the first time on appeal. RAP 2.5. Here, the Meyers did not substantively argue that the June 28 meeting was invalid. During closing argument, the Meyers stated, in passing, "the June 28th board meeting was not called to order in accordance with the bylaws and was objected to by a board member and was subsequently not a valid meeting." RP at 1561. The Meyers made the same claim in their motion for reconsideration. These are the only mentions of the validity of the June 28 meeting. The Meyers' trial brief did not raise the validity of the meeting. Because the Meyers did not substantively argue at trial that the June 28 meeting was invalid, we decline to review the issue.

*Fines/Special Assessments*

The Meyers argue that, without a previously adopted fine schedule, the only recourse available to Eagle Springs was the cost to remedy the violative conditions pursuant to CCR section 2.11. They contend that, because Eagle Springs did not incur costs to remedy the violations, they could not assess any fines against the Meyers, and the fines that were levied against them are invalid. This argument fails because we already determined that Eagle Springs adopted a valid fine schedule, pursuant to RCW 64.38.030(11), prior to levying fines against the Meyers for their violations of the CCRs.

*Purpose of Fines/Special Assessments*

The Meyers claim the fines were levied against them for an invalid purpose, namely, for failing to provide a plan of action to remedy the violations. They posit RCW 64.38.020(11) does not allow fines to be levied for failure to comply with a HOA's request to provide a corrective plan. However, RCW 64.38.020(11) allows fines to be levied "for violation of the bylaws, rules, and regulations of the association." To the extent fines were assessed for the Meyers' failure to provide a corrective plan, those fines were valid. CCR section 2.11 states an owner "shall correct [the violations] or, if not readily correctable within fifteen (15) days after notice from the Association, the Owner shall submit corrective plans proposing its remedy to the condition complained of with fifteen (15) days after notice from the Association." Ex. P-34. The Meyers failed to provide a corrective plan, therefore violating CCR section 2.11. RCW 64.38.020(11) permits fines to be assessed for the violation of CCR section 2.11 and for failing to remediate the violations, as discussed above.

In sum, the court did not err in concluding the fines assessed against the Meyers were valid.

ENFORCEMENT OF THE CCRS

The Meyers argue Eagle Springs could not enforce the CCRs because: (1) Eagle Springs' actions were arbitrary and capricious; (2) Eagle Springs is equitably estopped from enforcing the CCRs; (3) Eagle Springs did not previously enforce the CCRs; and

(4) the CCRs the Meyers violated are ambiguous. We are unpersuaded by the Meyers' arguments.

*Arbitrary and Capricious*

The Meyers claim Eagle Springs' enforcement of the CCRs was "discriminatory, arbitrary, capricious, and not reasonable." Br. of Appellants at 46. They primarily argue Eagle Springs acted arbitrarily and capriciously because it did not routinely enforce the CCRs prior to enforcing them against the Meyers. They additionally argue Eagle Springs' complaint process is flawed, and it was arbitrary and capricious for Eagle Springs to allege they violated CCRs other than the CCRs noted in the original complaint.

The court found "[t]he Meyers failed to prove [Eagle Springs] has habitually and substantially tolerated violations of its CCRs nor that violations by other residents have eroded the general plan of the CCRs rendering their enforcement useless and inequitable." CP at 275. The court's finding is supported by substantial evidence.

Mr. Edwards testified that, during his time as a member of Eagle Springs, he observed other CCR violations. He also testified "a few . . . have been reported, and that is when the board would then take action." RP at 256. He testified all reported violations "required corrective action," that the violations were corrected, and that the Meyers' violations were the only ones that had not been corrected. RP at 256. Finally, he testified the Board had never encountered a situation where a member refused to comply with the

CCRs after multiple notices prior to the June 28 meeting. Mr. Edwards' testimony supports the trial court's finding that Eagle Springs did not habitually tolerate violations of the CCRs.

The Meyers point to testimony of their witnesses refuting Mr. Edwards' claim that Eagle Springs had previously enforced the CCRs against other owners. However, "an appellate court is simply not permitted to reweigh the evidence and come to a contrary finding." *Quinn v. Cherry Lane Auto Plaza, Inc.*, 153 Wn. App. 710, 717, 225 P.3d 266 (2009). Because substantial evidence supports the court's finding that Eagle Springs did not habitually tolerate violations of the CCRs, the Meyers' argument that Eagle Springs acted arbitrarily and capriciously by unfairly enforcing the CCRs solely against them fails.

Further, the Meyers' contention that the complaint process is flawed is unpersuasive. They argue "the arbitrary practice by the Board to only enforce [CCRs] if a written complaint is received by the members, and then choosing how to respond to the complaint, is not reasonable and is flawed." Br. of Appellants at 47. It is unclear how a complaint system for addressing violations is unfair or flawed. Without a complaint system, Eagle Springs may never be made aware CCR violations. The Meyers point out the potential for abuse of the complaint system by owners who are "in dispute with another" owner. Br. of Appellants at 49. However, potential abuses of the complaint process does not render the process arbitrary and capricious.

23

Finally, the Meyers take issue with the fact that the complaints against them only mention CCR section 5.10 but the letters and lawsuit allege violations of CCR sections 5.3, 5.4, 5.10, and 5.11. It is unclear how Eagle Springs' identification of other violations of the CCRs was arbitrary and capricious.

*Equitable Estoppel*

The Meyers argue Eagle Springs "has unclean hands and has created equitable estoppel[ ]." Br. of Appellants at 51. The Meyers primarily argue that prior to purchasing the Property they were told that the CCRs were not enforced and that other properties also had CCR violations. These arguments are unpersuasive.

Equitable estoppel is generally not favored, and the party asserting it must prove each element by clear, cogent, and convincing evidence. *Colonial Imports, Inc. v. Carlton N.W., Inc.*, 121 Wn.2d 726, 734, 853 P.2d 913 (1993). The three elements of equitable estoppel are:

> (1) an admission, statement, or act inconsistent with a claim afterward asserted, (2) action by another in reasonable reliance upon that act, statement or admission, and (3) injury which would result to the relying party if the first party were allowed to contradict or repudiate the prior act, statement or admission.

*Id.* The court did not find the Meyers proved equitable estoppel.

The Meyers argue that prior to purchasing the Property, Mr. Edwards told them that the CCRs were not enforced. They also argue they witnessed CCR violations on other properties. However, even if Mr. Edwards *did* tell them the CCRs were not

enforced, they fail to explain why it was reasonable for them to purchase the Property based solely on his word and their opinion that other properties were in violation of the CCRs. The Meyers fail to explain what evidence, aside from Mr. Edwards' statements, and their observations of alleged CCR violations on other properties, satisfies each element of equitable estoppel.

Further, the Meyers contend other properties also have conditions violative of the CCRs. As previously addressed, the court found, and substantial evidence supports, that Eagle Springs has, in the past, enforced CCR violations against other property owners. If the Meyers believe other properties are in violation of the CCRs, they may present a complaint to the Board.

*Prior CCR Enforcement*

The Meyers posit Eagle Springs has not enforced the CCRs in the past. They contend Eagle Springs "has not enforced any of the [CCRs] in over 15 years." Br. of Appellants at 55. This argument is addressed above. The court's finding that "[t]he Meyers failed to prove [Eagle Springs] has habitually and substantially tolerated violations of its CCRs" is supported by substantial evidence. CP at 275.

*Ambiguity*

The Meyers present various arguments as to why CCR sections 5.10 and 5.11 are ambiguous. We disagree that the CCRs are ambiguous.

25

"Interpretation of covenants is a question of law based on the rules of contract interpretation." *Bangerter v. Hat Island Cmty. Ass'n*, 199 Wn.2d 183, 189, 504 P.3d 813 (2022). "'A written instrument is ambiguous when its terms are uncertain or capable of being understood as having more than one meaning.'" *Rydman v. Martinolich Shipbuilding Corp.*, 13 Wn. App. 150, 153, 534 P.2d 62 (1975) (quoting *Murray v. Western Pac. Ins. Co.*, 2 Wn. App. 985, 989, 472 P.2d 611 (1970)).

Eagle Springs argues the Meyers did not argue that the CCR sections were ambiguous below, and we should therefore not address the issue. RAP 2.5. However, the record reflects otherwise. The Meyers made their ambiguity argument throughout trial. Thus, we will address the argument.

The Meyers argue CCR section 5.10 is ambiguous. That section reads:

> 5.10 <u>Trash:</u> No Tract may be used for temporary or permanent storage of rubbish or trash (collectively, garbage). No garbage may be kept on any Tract except in covered containers and screened from view from adjacent Tracts.

Ex. P-34. The Meyers claim the first sentence of CCR section 5.10 does not allow any trash to be stored on a property, even temporarily, but the second sentence allows trash to be kept in containers screened from view. Thus, they argue the section is ambiguous.

The first sentence mandates that a property may not be used for temporary or permanent storage of garbage. However, the second sentence provides an exception for trash in "covered containers." Ex. P-34. This allows property owners to maintain trash

receptacles as long as they are covered and screened from view. CCR section 5.10 is not ambiguous.

The Meyers also argue CCR section 5.10 is ambiguous because it is "unclear what specifically is considered rubbish, trash and garbage." Br. of Appellants at 60. This argument is unpersuasive. Just because the terms are not specifically defined does not mean the terms are ambiguous. A reasonable person knows what garbage is. In the Meyers' case, there is no dispute that the Property contained copious amounts of "garbage."

The Meyers also argue CCR section 5.11 is ambiguous. That section states:

> 5.11 <u>Junkyards, Auto Repair, Second-Hand Business, Material Storage:</u> No junkyards, auto repair, second-hand business or other commercial uses that create a negative visual impact, excessive noise or congestion from traffic or parking shall be conducted on any Tract. No storage of trucks, cars, buses, machinery, equipment or building materials shall be stored on any Tract unless enclosed in a proper structure to not be visible from an adjoining Tract or passing on the roadway.

Ex. P-34. The Meyers claim they "believe 5.11 is only applicable to commercial usage, as described in the section title and first sentence." Br. of Appellants at 61. The Meyers do not otherwise explain how or why the CCR is ambiguous, and we conclude it is not.

The Meyers claim there was no evidence at trial that there was commercial usage of their Property. However, the second sentence of the CCR mandates trucks, cars, buses, building materials, or other items may not be stored on a Property. There was

ample evidence at trial that the Meyers, at minimum, stored building materials and defunct vehicles on the Property.

In sum, the Meyers' arguments that Eagle Springs could not enforce the CCRs fails. Eagle Springs was entitled to enforce the CCRs and, in turn, assess the fines.

FIDUCIARY DUTIES

The Meyers argue the Board breached its fiduciary duties by: (1) failing to research and consider the best interests of the owners when making decisions, thereby breaching their duty of care, and (2) unlawfully removing Ms. Meyer from her position as the board secretary. Because these issues were not raised below, we decline to address them on appeal.

RAP 2.5(a) allows this court to "refuse to review any claim of error which was not raised in the trial court" subject to some exceptions, not relevant here. The Meyers did not argue below that the Board breached their fiduciary duties or that Ms. Meyer's removal from the Board was wrongful. They also did not plead breach of fiduciary duty as an affirmative defense or counterclaim. Thus, this issue is raised for the first time on appeal, and we decline to address it.

MONETARY RELIEF

The Meyers argue the court erred in awarding Eagle Springs a money judgment. The Meyers posit the court's decision to award Eagle Springs $16,157.00 for "unpaid special assessments" was erroneous because Eagle Springs never requested monetary

relief below. Br. of Appellants at 3. Eagle Springs responds that it presented evidence throughout trial supporting monetary relief, the Meyers included a money judgment in their own proposed findings and conclusions, and this issue is raised for the first time on appeal. We agree with Eagle Springs.

The court found, "This action involves [Eagle Springs'] claims for declaratory judgment, permanent injunction and a money judgment pertaining to real property, situated in Grant County, Washington." CP at 273. Ultimately, the court awarded Eagle Springs a judgment against the Meyers "for $16,157.00 for unpaid special assessments." CP at 275. The Meyers challenge the finding that Eagle Springs requested a money judgment and the court's award of a money judgment to Eagle Springs. The court's finding is supported by substantial evidence.

Eagle Springs' complaint requested, among other relief, "[j]udgment against Meyer, and in favor of [Eagle Springs], for the delinquent Special Assessments levied by [Eagle Springs] against Meyer and the Property, in an amount to be proven at trial." CP at 13. Thus, the Meyers' argument that Eagle Springs never requested monetary relief fails. Further, the Meyers did not argue below that Eagle Springs was not entitled to a money judgment. Indeed, the Meyers' own proposed findings and conclusions stated "[j]udgment be and is awarded in favor of [Eagle Springs] and against [the Meyers] for unpaid fines." CP at 424. The court did not err in granting Eagle Springs a money judgment for the Meyers' unpaid assessments.

The court's grant of monetary relief to Eagle Springs was proper.

CITATION TO INCORRECT STATUTE

The Meyers argue the court cited the incorrect nonprofit corporations act statute in its findings. Eagle Springs concedes the incorrect statute was cited but contends the error was harmless. We agree with Eagle Springs.

The trial court, in finding of fact 4, stated Eagle Springs is a nonprofit corporation "subject to the statutory requirements of RCW 24.03A." CP at 274. The Meyers challenge this finding and correctly point out that chapter 24.03A RCW did not take effect until January 1, 2022. LAWS OF 2021, Special Sess. Bill 5034 ch. 176, § 1171. Chapter 24.03A RCW replaced chapter 24.03 RCW. LAWS OF 2021, Special Sess. Bill 5034 ch. 176, § 1013.

As the Meyers recognize, Eagle Springs' lawsuit was filed in July 2021. Consequently, during the relevant time period, Eagle Springs was subject to chapter 24.03 RCW not chapter 24.03A RCW, which had not yet been enacted. Eagle Springs concedes the court should have cited chapter 24.03 RCW, but argues the error is harmless. "Under the harmless error test in civil cases, an error is harmless when it does not materially affect the outcome of the trial." *Lavington v. Hillier*, 22 Wn. App. 2d 134, 148, 510 P.3d 373 (2022). The Meyers do not explain how this error affected the court's conclusions or otherwise prejudiced them. Thus, the court's error was harmless.

INCORRECT DEFINITIONAL STATUTE OF AN HOA

The Meyers argue the trial court's findings cite to the incorrect governing statute of Eagle Springs. Eagle Springs concedes error but again argues it was harmless. We agree with Eagle Springs.

In finding of fact 5, the trial court stated "[Eagle Springs] is a homeowner's association . . . as defined in RCW 64.90." CP at 274. However, chapter 64.90 RCW is Washington's "Uniform Common Interest Ownership Act." The Meyers posit the court should have cited chapter 64.38 RCW, titled "Homeowners' Associations," specifically RCW 64.38.010(12), which provides the definition for "[h]omeowners' association" or "association."

The Meyers do not explain how the court's citation to the incorrect chapter prejudiced them or affected its overall decision. They argue there are provisions in chapter 64.38 RCW that are relevant and supportive of their position on other issues such as foreclosure requirements and meeting requirements. However, the court's finding was specific to the fact that Eagle Springs was an HOA pursuant to a statutory definition. The court's citation to the wrong definitional statute of a homeowner's association has no bearing on the relevant statutes for the Meyers' other claims or defenses. Thus, the error was harmless.

INCORRECT DESCRIPTION OF RCW 64.38.020(11)

The Meyers contend finding of fact 9 incorrectly described RCW 64.38.020(11).

Assuming their contention is valid, any error is harmless.

Finding of fact 9 states: "RCW 64.38.020(11) authorizes HOAs to impose special assessments against members to cover the cost of bringing a tract of land and its owner into compliance with its bylaws and to impose and collect late payment of assessments." CP at 274. RCW 64.38.020(11) allows an HOA to "[i]mpose and collect charges for late payments of assessments and . . . levy reasonable fines in accordance with a previously established schedule adopted by the board of directors and furnished to the owners for violation of the bylaws, rules, and regulations of the association." The statute does not allow for costs to bring a tract into compliance with the bylaws or CCRs. However, section 2.11 of the CCRs *does* allow Eagle Springs to issue special assessments for the cost of bringing a tract into compliance with the CCRs. Thus, when read together, the CCRs and RCW 64.38.020(11) allow Eagle Springs to "impose special assessments against members to cover the cost of bringing a tract of land and its owner into compliance with its bylaws and to impose and collect late payment of assessments." CP at 274.

Though the court's recitation of the powers RCW 64.38.020(11) grants to HOAs was not wholly correct, the error was harmless. The Meyers do not explain how this slightly erroneous finding affected the outcome here. Further, the court's statement,

32

though wrongfully wholly attributed to RCW 64.38.020(11), is supported by substantial evidence. Any error is therefore harmless.

BIASED AGAINST THE MEYERS

The Meyers argue the judge was biased against them. They point to the fact that the judge apparently knew a witness and argue that the court gave preferential treatment to Eagle Springs. We disagree.

"Due process, the appearance of fairness doctrine and Canon [2.11] of the Code of Judicial Conduct . . . require a judge to disqualify himself if he is biased against a party or his impartiality may reasonably be questioned." *State v. Dominguez*, 81 Wn. App. 325, 328, 914 P.2d 141 (1996). However, there is a presumption that a judge performs his or her functions regularly and properly without bias or prejudice. *Kay Corp. v. Anderson*, 72 Wn.2d 879, 885, 436 P.2d 459 (1967); *Jones v. Halvorson-Berg*, 69 Wn. App. 117, 127, 847 P.2d 945 (1993). Thus, a party seeking to overcome that presumption must offer some kind of evidence of a judge's actual or potential bias. *Wolfkill Feed & Fertilizer Corp. v. Martin*, 103 Wn. App. 836, 841, 14 P.3d 877 (2000); *Dominguez*, 81 Wn. App. at 329.

The Meyers first point to the fact that the trial court judge apparently knew a witness. The court made the following disclosure pretrial:

> THE COURT: I just want to let you know, if he's not a witness, maybe it's no big deal. I know Raphael [Gomez]. I go roughly once a week to lunch at the Senior Center, and I've met him there. We eat together frequently and I

33

> enjoy his company and I intend to go to the senior center this Wednesday.
> If the trial is not over, I may see him there, and if you prefer—yes, sir?

RP at 74. Eagle Springs' counsel replied, "I don't have an issue with that." RP at 74.

The court then asked, "Mrs. Meyer, do you want to weigh in?" Ms. Meyer replied, "No, I'm fine, your Honor." RP at 74. The judge properly disclosed he knew a witness, and the Meyers did not object or otherwise raise any issue with the judge trying the case. They cannot now claim on appeal that the judge was biased based on his knowing a witness.

The Meyers next argue the court gave preferential treatment to Eagle Springs by encouraging them to reopen evidence, allowing them to make disparaging comments about the Meyers, allowing them to take recesses, and by not ruling on certain motions and issues.

The Meyers claim the court's decision to allow Eagle Springs to reopen evidence following their motion to dismiss showed bias against them. Eagle Springs rested its case with "reservation of rebuttal testimony for matters addressed in defendant's case in chief." RP at 343. The Meyers then immediately moved for dismissal on the basis that Eagle Springs lacked "physical evidence showing a violation existed in May or June of 2020." RP at 345. After further discussions, the court asked whether the evidence showed the violations were visible from "an adjoining tract." RP at 348. Eagle Springs was surprised that the court thought it needed to prove the violations were observable from an adjacent property. The court then asked if Eagle Springs wanted to "reopen and

put on somebody who is going to testify that it was visible from off site." RP at 362.

Eagle Springs submitted to the court that it made a prima facie case but ultimately moved

to reopen evidence, which the court granted.

"'A motion to reopen a proceeding for the purpose of introducing additional

evidence is addressed to the sound discretion of the trial court.'" *State v. Luvene*, 127

Wn.2d 690, 711, 903 P.2d 960 (1995) (quoting *State v. Sanchez*, 60 Wn. App. 687, 696,

806 P.2d 782 (1991)). Under the circumstances, it was not inappropriate nor did it

demonstrate bias, for the court to encourage and allow Eagle Springs to reopen evidence.

The court essentially argued the Meyers' motion to dismiss for them before asking if

Eagle Springs wanted to reopen evidence. This does not demonstrate it was biased

towards one party or the other. Further, the Meyers fail to explain how the court abused

its discretion by allowing Eagle Springs to reopen evidence.

Next, the Meyers contend the court allowed Eagle Springs to make disparaging

comments about them and their property. The Meyers point to Eagle Springs' comments

that their "tiny home" was actually a "shed," and that the RV on the Property was

"dilapidated." RP at 1326, 382, 384-85. They point to Canon 2 of the Code of Judicial

Conduct, which provides "[a] judge shall require lawyers in proceedings before the court

to refrain from manifesting bias or prejudice, or engaging in harassment, against parties,

witnesses, lawyers, or others." Br. of Appellants at 70. Contrary to the Meyers'

contention that Eagle Springs received preferential treatment, the Meyers also received substantial latitude in how they were allowed to present their defenses at trial.

In once such instance, Eagle Springs' counsel complained that a witness for the Meyers, as well as Mr. Meyer himself, was engaging in conversations on social media, during trial, about the counsel's physical appearance and the trial. Eagle Springs requested the offending witness be excluded from the witness list and for a gag order prohibiting witnesses from discussing the proceedings. The court declined both requests. The court simply stated, "obviously this is an emotionally charged situation. The sooner we get this done the better." CP at 403. In sum, the record does not reflect Eagle Springs received preferential treatment from the court.

The Meyers also take issue with the court allowing Eagle Springs to take recesses and breaks due to tardy witnesses and planned vacations. It is unclear how the court's accommodation of witnesses' schedules and counsels' preplanned vacation demonstrated bias against the Meyers.

Finally, the Meyers argue the court failed to rule on certain motions and issues, specifically Eagle Springs' foreclosure claim. They argue the claim should have been dismissed by the court, and the court showed bias in not doing so. This argument is unavailing. The court's failure to decide an issue or claim, even if error, does not amount to bias against one party or another absent some other evidence.

The trial court was not biased against the Meyers.

No. 40049-2-III
*Eagle Springs v. Meyer*

ATTORNEY FEES

Eagle Springs requests their reasonable attorney fees on appeal pursuant to

RAP 18.1(b) and CCR section 2.12. CCR section 2.12 provides:

> The Declarant, and/or Board may cause a lawsuit to be commenced and maintained in the name of the Association against an Owner to enforce the payment of any delinquent assessment or to enforce any other pertinent provision of this Declaration. Any judgment rendered in any such action shall include the amount of delinquency, interest at the rate of twelve percent (12%) per annum from the date of delinquency, the amount of damages proven, court fees, and *reasonable attorney's fees* which are incurred by the Association as fixed by the court.

Ex. P-34 (emphasis added). Below, the court awarded Eagle Springs its attorney fees

pursuant to the CCRs. Eagle Springs has prevailed in this appeal and has incurred

attorney fees to respond to the Meyers' appeal. Thus, Eagle Springs is entitled to their

attorney fees on appeal.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Cooney, J.

WE CONCUR:

_____         _____
Fearing, J.                                              Staab, A.C.J.

37